## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| YASHIMURA WASHINGTON,       ) | |
| ) | |
| Plaintiff,   ) | |
| ) | **No. 12 C 4995** |
| v.     ) | |
| ) | **Magistrate Michael T. Mason** |
| CAROLYN W. COLVIN, Acting  ) | |
| Commissioner of Social Security[1]  ) | |
| ) | |
| Defendant.   ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant Yashimura Washington ("Washington" or "claimant") has brought a

motion for summary judgment [20] seeking judicial review of the final decision of the

Commissioner of Social Security (the "Commissioner"). The Commissioner denied

Washington's claim for Supplemental Security Income ("SSI") under the Social Security

Act (the "Act"), 42 U.S.C. § 1382c(a)(3)(A). The Commissioner has filed a cross-motion

for summary judgment [24] and memorandum in support thereof [25] asking the court to

uphold its prior decision. The court has jurisdiction to hear this matter pursuant to 42

U.S.C. § 1383(c)(3). For the reasons set forth below, Washington's motion for summary

judgment is granted in so much as Washington seeks a remand to the Social Security

Administration (the "SSA"). The Commissioner's motion is denied.

## I.  BACKGROUND

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for
Commissioner Michael J. Astrue as defendant in this suit.

A.    **Procedural History**

Washington applied for SSI on September 9, 2009, alleging disability beginning on May 2, 2009 due to morbid obesity, asthma, hypertension, nerve damage in both legs, back pain, and migraines.[2]  (R. 164-69.)  Her application was denied initially on December 28, 2009, and upon reconsideration on June 11, 2010.  (R. 103-07, 121-24.)  Washington then filed a timely request for a hearing.  (R. 125-26.)  On May 19, 2011, Washington appeared with counsel at a hearing before Administrative Law Judge ("ALJ") Judith S. Goodie.  (R. 46-97.)  Both Washington and vocational expert ("VE") Thomas F. Dunleavy testified at the hearing.

On August 24, 2011, ALJ Goodie issued a written decision finding that Washington was not disabled under the Act.  (R. 27-40.)  Washington filed a timely request for review with the Appeals Council, which was denied on April 20, 2012.  (R. 15-17, 23-25.)  As a result, ALJ Goodie's decision became the final decision of the Commissioner.  This action followed.

B.    **Medical Evidence**

1.    **Treating Physicians**

At the time she applied for benefits, Washington was twenty-seven years old. She stands six feet two inches tall and weighs approximately 430 pounds.  Medical records reveal she has received treatment for various conditions, including morbid obesity, migraines, shortness of breath, and palpitations.

---

[2] It also appears that Washington applied for disability insurance benefits ("DIB") under Title II. However, Washington's DIB claim did not advance to the hearing stage and is not at issue before this court.  (*See* R. 49).

On August 23, 2009, Washington was transported by ambulance to the emergency department of Stroger Cook County Hospital ("Cook County") complaining of a severe right-sided headache, as well as numbness in her right arm, sensitivity to light, and nausea.[3] (R. 254, 261.) Washington denied vomiting, visual or speech disturbances, motor weakness, and gait instability. (*Id.*) Washington reported using marijuana daily over the last three months, up to five times a day. (R. 261, 264.) X-rays of the cervical spine, limited to evaluation through C6, showed no evidence of fracture, subluxation, or other acute bony injury. (R. 268.) Her CT scan was normal. (R. 278.)

The examining resident physician, Dr. Atish Mathur, commented on Washington's known history of asthma and her morbid obesity. (R. 261-62.) Dr. Mathur assessed possible migraine or pseudotumor cerebri, well-controlled asthma (with albuterol inhaler), and hypertension. (R. 262.) The attending physician, Dr. Daryl Woods, commented on Washington's decreased hand grip and her right-side numbness. (R. 266.) In addition to the assessments by Dr. Mathur, Dr. Woods assessed "RUE numbness and weakness" and noted "clinical findings consistent with C7 cervical radiculopathy possibly from cervical rib or disc disease." (*Id.*) He also documented her body mass index as 51.5. (*Id.*) Washington was discharged in stable condition on August 24, 2009 and was advised to follow-up with Dr. Mathur. (R. 270-71.) She was prescribed acetaminophen-hydrocodone, zolmitriptan, hydrochlorothiazide, and potassium chloride. (R. 271.) She was also advised to lose

---

[3] Washington had apparently visited Cook County a few days earlier with similar complaints. (R. 261.) She was sent home without medication after a normal CT scan and unsuccessful lumbar punctures. (*Id.*)

weight.  (R. 266.)

It appears that Washington saw Dr. Emanuel Diaz on September 8, 2009 at the Jorge Prieto Family Health Center ("Prieto Health Center") for management of migraines, hypertension, asthma, possible sleep apnea, and low back pain.  (R. 381-82.)  Washington complained of right arm numbness and explained that she was undergoing family stressors that caused insomnia.  (R. 381.)  Dr. Diaz reviewed the lab results from Washington's recent stay at Cook County and assessed controlled hypertension, among other things.  (*Id.*)  He commented that Washington's "body aches and pain could be due to anxiety and stressors."  (R. 382.)

Washington saw a Dr. Martinez at the Prieto Health Center on September 22, 2009.  (R. 379.)  Dr. Martinez listed generalized anxiety disorder with panic attacks as his diagnosis and also noted obesity.  (*Id.*)

On September 29, 2009, Washington presented to the emergency department of Mount Sinai Medical Center complaining of shortness of breath, palpitations, and associated dizziness, which had started a week prior.  (R. 284.)  Among other things, Washington described a history of chronic lower back pain, as well as a history of seizures per a diagnosis at Cook County.  (*Id.*)

A physical examination revealed tenderness in the lower back area and distant breath sounds due to obesity.  (R. 285.)  A limited chest x-ray showed no evidence of acute cardiopulmonary abnormality.  (R. 281.)  There was no evidence of pulmonary emboli.  (R. 294.)  Though Washington's initial EKG showed normal sinus rhythm, repeat testing showed sinus arrhythmia with occasional and consecutive premature ventricular complexes and fusion complexes.  (R. 286, 303, 307.)  A severely limited

4

echocardiogram revealed that the left ventricle appeared to be normal.  (R. 304.)

Washington was discharged on October 1, 2009 with diagnoses of aberrant supraventricular tachycardia, asthma, hypertension, and migraine headaches.  (R. 284.)  She was prescribed hydrochlorothiazide, potassium chloride, albuterol, tylenol, and magnesium oxide.  (R. 286-87.)  A sleep study for possible sleep apnea and a low salt diet were advised.  (R. 286, 312.)  Washington was directed to follow up with Dr. Mathur and a cardiologist.  (R. 286, 309.)

On October 6, 2009, Washington followed up with Dr. Mathur as directed.  (R. 325-27.)  A physical examination revealed primarily unremarkable results.  (R. 325.)  Dr. Mathur again assessed hypertension, migraines, and obesity.  (R. 326.)

Washington returned to the Prieto Health Center on October 30, 2009, at which time she was again diagnosed with generalized anxiety disorder with panic attacks by Dr. Martinez.  (R. 371-72.)  She was advised to continue with therapy.[4]  (R. 371.)

On February 2, 2010, Washington returned to see Dr. Mathur, complaining of intermittent right arm numbness with and without migraine attacks.  (R. 355.)  She also complained of lightheadedness, mostly on walking, sitting up suddenly, or bending over.  (*Id.*)  Her migraines were improving and she had no complaints of visual disturbances or gastric symptoms.  (*Id.*)  Dr. Mathur noted possible vertigo and commented that Washington's migraines were "well-controlled" with her medication.  (R. 356.)  Although her blood pressure was high at the appointment, this was attributed to the fact that she had been without her medication for a week.  (*Id.*)  Dr. Mathur ordered an EMG to

---

[4] It is unclear from the record when Washington began undergoing therapy.

5

assess her right arm numbness. (*Id.*) On April 7, 2010, a clinical neurological examination revealed a positive Tinel sign on Washington's right wrist. (R. 360.) The EMG, conducted that same day, showed "evidence of a median mononeuropathy at the right wrist." (*Id.*)

Washington returned to the Prieto Health Center on October 5, 2010. (R. 370.) At that appointment, Washington appears to have complained that she suffers from migraines two days a week and explained that she seeks relief by decreasing noise and sleeping in a dark room. (*Id.*) Among other things, the examining physician assessed migraines, anxiety, stable hypertension, and insomnia. (*Id.*) A similar assessment was made on December 2, 2010, at which time it was also noted that her migraines had mildly improved. (R. 369.) Carpal tunnel syndrome was also noted on that date and wrist splints were recommended.[5] (*Id.*) A progress note from January 7, 2011 is, for the most part, illegible. (R. 389.)

### 2. Agency Consultants

On December 7, 2009, Washington underwent a consultative exam with Dr. Sarada Deshpande of Chicago Consulting Physicians. (R. 328-36.) At that time, Washington explained that she suffered from "pretty bad migraine headaches" about twice a week, which last a couple of hours. (R. 329.) The headaches are mostly on the right side and she rated them an eleven on a ten-point scale. (*Id.*) She described associated nausea, but no vomiting. (*Id.*) According to Washington, medication does

---

[5] Though the signatures on the October 5 and December 2 examination documents are illegible, based on Washington's hearing testimony, it appears her treating physician, Dr. Peralta, conducted those examinations. (*See* R. 67, 73.)

not alleviate her headaches.  (*Id.*)  Washington also stated that she has suffered from severe pain in both legs since she was diagnosed with toxic shock syndrome at age fifteen.  (*Id.*)  She gets minor relief from ibuprofen.  (*Id.*)  She denied the use of a cane. (*Id.*)  She claimed she experiences shortness of breath after walking for two blocks. (*Id.*)

Washington further explained that she suffers from intermittent back pain, which she rated an eight on a ten-point scale.  (R. 329.)  Her back pain worsens upon standing and walking.  (*Id.*)  Additionally, Washington said that she suffers from left knee pain as a result of a car accident in her childhood.  (*Id.*)  This too worsens with walking and in cold weather.  (*Id.*)  Washington claimed that both her back pain and left knee pain are alleviated "a little" with medication.  (*Id.*)  Washington also reported numbness in her right arm, which causes her to lose feeling in her fingertips.  (*Id.*) Washington denied illicit drug use.  (*Id.*)

On physical examination, Washington weighed 430.8 pounds and had a blood pressure of 130/80.  (R. 329.)  Dr. Deshpande described her general appearance as "a morbidly obese female in no apparent distress."  (*Id.*)  He noted that Washington displayed "a waddling gait with a mild limp on the left knee."  (R. 330.)  She could walk over fifty feet without assistance.  (*Id.*)  Washington had mild difficulty getting on and off the exam table, moderate difficulty doing certain special maneuvers, and severe difficulty squatting.  (R. 330, 332.)  Straight leg testing was negative.  (R. 332.)  Range of motion in her cervical spine, shoulders, elbows, and wrists was normal.  (R. 330, 333-34.)  Lumbar spine flexion was 60/90 degrees and painful.  (R. 330, 334.)  Right knee flexion was 90/150 degrees with no pain and left knee flexion was 80/150 degrees with

pain.  (R. 330, 335.)  Her grip strength was normal.  (R. 330, 332.)  Washington did display decreased sensation in her right hand.  (R. 330.)

X-rays of the left knee revealed a "deformity of the medial cortex tibial diaphysis that has imaging features that could represent a healed fracture but is non-specific."  (R. 340.)  X-rays of the lumbar spine showed no significant abnormalities.  (R. 341.)  Pre-med pulmonary function testing indicated a mild restriction.  (R. 337.)  It appears that post-med readings were not taken.

On December 15, 2009, Dr. James Madison completed a Physical Residual Functional Capacity Assessment.  (R. 342-49.)  According to Dr. Madison's assessment, Washington can occasionally lift twenty pounds, frequently ten, can stand and/or walk for at least two hours in an eight-hour day, and can sit for about six hours in an eight-hour day.  (R. 343.)  Dr. Madison also found that Washington had limited pushing and pulling abilities in her lower extremities.  (*Id.*)  In reaching these conclusions, Dr. Madison noted that lifting and carrying more than twenty pounds would exacerbate her condition.  (*Id.*)  He also commented on Washington's limited knee flexion and the x-ray showing a deformity in her left knee.  (*Id.*)

Dr. Madison further found that Washington can frequently climb ramps and stairs and can occasionally climb ropes, ladders, and scaffolds, but should never do so to perform work related activities.  (R. 344.)  He concluded that Washington should avoid concentrated exposure to pulmonary irritants and hazards.  (R. 346.)  Dr. Madison found no manipulative, visual, or communicative limitations.  (R. 345-46.)

On June 9, 2010, Dr. Ernst Bone affirmed Dr. Madison's RFC assessment.  (R. 363-65.)

8

### C.    Claimant's Testimony

Washington appeared with counsel at the administrative hearing before ALJ Goodie.  At the time of the hearing, Washington was twenty-eight years old.  (R. 52, 54-55.)  She completed high school and one year of college course work.  (R. 52.)  She resides in the basement of a house with two aunts and her cousin.  (R. 60.)  She takes most of her meals in the basement and only goes upstairs to eat about three times a month.  (R. 61.)  Washington has not had a driver's license since 2005 or 2006 when it was suspended.  (R. 61-62.)  She opined that she would "probably not" be able to operate a car even if she had a license.  (R. 62.)

Washington explained that she has suffered from pain in her left knee since she was in a car accident at age seven.  (R. 82-83.)  Her knee hurts "all the way to the core" and she rated the pain a twenty-five on a ten-point scale.  (R. 83.)  Washington testified that she was scheduled to receive cortisone shots in her knee in the next couple of weeks.  (*Id.*)  Washington also suffers from swelling and a numbing pain in her legs, which she attributes to a case of toxic shock syndrome at age fifteen.  (*Id.*)  She compared the pain in her legs to getting stuck with needles, and said she experiences that pain more often than not.  (R. 84.)  The numbness lasts until she props her feet on a pillow.  (*Id.*)  Washington is most comfortable when she is laying with her back, neck, and leg on pillows.  (*Id.*)  When asked why she stopped working in 2005, Washington stated that her knee pain, leg pain, and carpal tunnel had gotten worse and inhibited her ability to work.  (R. 59-60.)

Washington testified that she can walk up to two blocks, but it takes her about twenty minutes to do so.  (R. 78-79.)  She can stand for twenty minutes before needing

to sit down. (R. 79.) As for sitting, she can sit for thirty-five minutes before discomfort sets in.[6] (*Id.*) Washington is unable to use the spiral staircase when she leaves the basement. (R. 80.) Instead, she climbs the three stairs to the back door and sits on the bench outside until she can get up. (*Id.*) There is a railing on both sides of the stairs. (*Id.*) She sometimes uses a cane, though it was not prescribed. (R. 78.) She forgot her cane the day of the hearing. (R. 81.) Washington did wear a splint on her right hand to the hearing, which she said she got in late 2010 or early 2011 from Dr. Peralta. (R 67.) Washington explained that she wears the right splint all day and at night and wears the left splint as needed. (R. 68-69.) She is unsure how much weight she can lift. (R. 79.) She explained that she recently tried to lift a fan, but dropped it on herself. (*Id.*) Washington can no longer take showers because standing is too difficult. (R. 85.) Instead, she sits on the side of the tub and bathes herself. (*Id.*)

Washington spends her time alone, though she testified that she does get along with her family members when she sees them. (R. 62.) Washington testified that the only reason she goes out of the house is to go to the doctor. (*Id.*) Her cousin does her grocery shopping for her. (*Id.*) She used to volunteer at a church, but stopped when it became too physically demanding. (R. 62-63.) She watches television, listens to music, and reads lots of books. (R. 64.) On occasion, Washington tries to write short stories and poems. (*Id.*) She handwrites her poems, but it takes more effort than it used to to complete a paragraph or sign her name. (R. 66-67, 81.) Washington has a few friends, one of which visits occasionally. (R. 64.) She has a very low energy level

---

[6] After explaining her sitting limitations, Washington asked the ALJ if she could stand because she was uncomfortable after sitting for forty-five minutes. (R. 79.)

because she does not get much sleep and her medication makes her "loopy." (R. 85.) Washington was supposed to undergo a sleep study, but could not afford to pre-pay the cost. (R. 71.) She is also unable to afford eye glasses. (R. 78.)

Washington testified that she has migraines about three times a week. (R. 81.) Her severe migraines, which occur every few weeks, can last up to a day and a half. (R. 81-82.) Her less debilitating migraines last a couple of hours. (R. 82.) When suffering from a migraine, Washington turns off the tv, music, and lights, and puts her head under a pillow. (*Id.*)

Washington told the ALJ she has been seeing Dr. Martinez at the Prieto Clinic for mental health issues twice a month since April 2011. (R. 76.) From November 2010 to April 2011, she saw him monthly. (R. 77.) Prior to that, she saw him once every three months beginning in 2009.[7] (*Id.*) According to Washington, the frequency of her visits with Dr. Martinez increased because he thought it was unhealthy she spent so much time by herself and she was showing increasing signs of depression. (R. 87.) Washington testified that she suffers from anxiety attacks "a lot" when she's around people. (R. 86.)

Washington testified that she takes zolmitriptan, benadryl, hydrochlorothiazide, fluoxetine, clonazepam, propranolol, and amitrptyline. (R. 72-76.) Washington explained that she stopped using marijuana "recreationally" years ago. (R. 65.) She continues to smoke marijuana a couple of times a week for pain relief from her migraines and to help her sleep. (R. 65-66.)

---

[7] Despite the alleged frequency of visits, the administrative record does not include extensive treatment records from Dr. Martinez.

D.      **Vocational Expert's Testimony**

VE Dunleavy also testified at the hearing.  The VE first classified Washington's past jobs, although he was doubtful they amounted to substantial gainful activity.  (R. 90.)  He explained that Washington's positions as a data entry clerk and a telemarketer would be classified as sedentary and semi-skilled.  (*Id.*)  He classified her position as a child monitor as light and semi-skilled.  (*Id.*)

ALJ Goodie asked VE Dunleavy to consider a hypothetical individual of Washington's age, education, and experience who has the functional capacity to lift and carry ten pounds, sit for six hours, and stand and walk for two hours.  (R. 90.)  The hypothetical individual has limited pushing and pulling abilities with the lower extremities; can occasionally climb stairs, stoop, crouch, crawl, and kneel; can never climb ladders; and must avoid concentrated exposure to irritants, hazardous machinery, and unprotected heights.  (*Id.*)  Lastly, the hypothetical individual has frequent but not constant use of the right dominant hand for fine and gross manipulation, and can have only occasional interaction with the general public.  (*Id.*)

When asked if such a hypothetical individual could perform Washington's past jobs, VE Dunleavy responded in the negative.  (R. 90-91.)  However, VE Dunleavy did conclude that the individual could perform work in two "occupational clusters" (1) sorters, typified by the position of table worker (3,000 jobs in Illinois); and (2) visual inspectors, typified by the position of touch up screener (4,000 jobs in Illinois).  (R. 91-92.)  Individuals in these positions could not be off task for more than 10% of the time and absences could not exceed ten times per year.  (R. 92, 95.)  Additionally, only one

12

absence would be permitted during the first ninety days of employment. (R. 95.)

After VE Dunleavy provided testimony, Washington's attorney asked that the record remain open for seven days so that she could attempt to obtain additional records or an opinion from Dr. Martinez at the Prieto Health Clinic. (R. 95.) The ALJ advised counsel that if she did not hear from her within seven days, she would assume no such submission would be made. (R. 96.) It does not appear that any additional records from Dr. Martinez were submitted.

## II.     LEGAL ANALYSIS

### A.     Standard of Review

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (*quoting Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). And, although the ALJ is not required to address every piece of evidence, she must "build an accurate and logical bridge" from the evidence to her conclusion. *Clifford*, 227 F.3d at 872. Further, the ALJ must sufficiently articulate her assessment of the evidence to assure us that she "considered the important evidence" and to enable the court to "trace the path" of her reasoning. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

13

### B. Analysis under the Social Security Act

In order to qualify for SSI, a claimant must be "disabled" under the Act. A person is disabled if he or she is unable "to engage in any substantial activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). To determine whether an individual is disabled, the ALJ must consider the following five-step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy. 20 C.F.R. § 416.920; *Scheck*, 357 F.3d at 699-700. The claimant has the burden of establishing a disability at steps one through four. *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). At step five, the burden shifts to the Commissioner. *Id.*

ALJ Goodie applied this five step analysis. At step one, she determined that Washington had not engaged in substantial gainful activity since filing her application for benefits. (R. 32.) At step two, ALJ Goodie determined that Washington suffers from the following severe impairments: "morbid obesity, left knee deformity, and median neuropathy of the right wrist." (R. 32-34.) Next, at step three, ALJ Goodie found that Washington does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 34-35.)

14

ALJ Goodie went on to assess Washington's RFC. ALJ Goodie determined that Washington has the RFC to perform sedentary work as defined in 20 C.F.R. § 416.967(a).[8] Specifically, ALJ Goodie found that Washington can lift/carry up to ten pounds, sit for six hours in an eight-hour day, stand/walk for two hours in an eight-hour day, and has a limited ability to push and pull with her lower extremities. (R. 35.) Further, ALJ Goodie found that Washington can occasionally stoop, crouch, crawl, kneel, and climb stairs, but may never climb ladders. (*Id.*) The ALJ also concluded that Washington must avoid concentrated exposure to airborne irritants, hazardous machinery, and unprotected heights, and can frequently, but not constantly, use her dominant right hand for fine and gross manipulation. (*Id.*) Finally, Washington should be limited to no more than occasional interaction with the general public, and would be off task no more than 10% of the work day. (*Id.*)

Claimant now argues that ALJ Goodie (1) failed to properly analyze the impact of her migraines, (2) failed to properly analyze the impact of her mental illness, and (3) disregarded favorable evidence when assessing her RFC. We address these issues in turn below.

### C. The ALJ Did Not Err at Step Two When She Found That Washington's Migraines Did Not Constitute a "Severe Impairment."

According to Washington, ALJ Goodie failed to properly consider the effect of her migraine headaches at step two and when assessing her RFC. We address the former

---

[8] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a).

argument here.

Washington correctly points out that at step two of the disability evaluation process, the ALJ must determine which, if any, of a claimant's impairments are severe. 20 C.F.R. § 416.920. A "severe impairment" is one that significantly limits the claimant's physical or mental ability to do basic work activities. Social Security Ruling ("SSR") 96-3p, 1996 WL 374181, at *1.

Here, the ALJ determined that Washington's morbid obesity, left knee deformity, and median neuropathy of the right wrist constituted severe impairments. The ALJ went on to conclude that Washington's hypertension, asthma, marijuana abuse, migraine headaches, and anxiety were not severe impairments.

We find no reversible error in the conclusion that Washington's migraines were not a "severe impairment." Having found certain other impairments severe at step two, the ALJ was "obligated to consider the combined effect of all of a claimant's impairments, both severe and non-severe, at later stages." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *6 (N.D. Ill. Feb. 2, 2012) (*citing Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003). Thus, "as long as the ALJ proceeds beyond step two, as in this case, no error could result solely from his failure to label an impairment as 'severe.'" *Raines v. Astrue*, No. 06 C 0472, 2007 WL 1455890, at *7 (S.D. Ind. April 23, 2007). Nonetheless, because the ALJ must ultimately consider *all* of Washington's impairments when determining her RFC, it does not follow that, on the whole, the ALJ properly evaluated the effects of her migraines. *See Raines*, 2007 WL 1455890, at *7 ("What matters is that the ALJ considers the impact of all of the claimant's impairments - severe and non-severe - on his ability to work."). We address that issue below.

16

**D.  The ALJ Failed to Properly Develop the Record With Respect to Washington's Mental Illness.**

Washington next argues that the ALJ failed to properly analyze her mental illness.  The crux of Washington's argument is that the ALJ should have further developed the record on this issue by eliciting additional records and expert medical opinions.  We agree.

At the hearing, Washington testified that she suffers from anxiety attacks triggered by noise and people.  She also submitted records from her treating physician reflecting treatment for anxiety, including counseling and prescription medication.  Because those records were at times difficult to understand, and did not reflect the frequency of treatment testified to by the claimant, the ALJ gave claimant's attorney an additional seven days to submit an opinion from the treating psychiatrist.  No additional records were submitted and the ALJ issued her opinion based on the minimal mental health related records before her, which did not include an opinion from an agency consultant regarding Washington's mental RFC.

In finding that Washington's anxiety was not "severe" at step two and limiting her to only occasional contact with the public, the ALJ relied on claimant's descriptions of daily activities and abilities.  The ALJ only gave "some credit to [Washington's] testimony about anxiety," stating that "the failure of claimant to submit progress notes to corroborate her testimony about the frequency of her alleged mental health treatment weighs heavily against the credibility of her testimony."  (R. 38.)

The Commissioner is correct in stating that it falls within the ALJ's discretion to determine when and how to further develop the administrative record, and that a

claimant represented by counsel is presumed to have made her best case before the ALJ. *Griffin v. Barnhart,* 198 Fed. Appx. 561, 564 (7th Cir. 2006)*; Skinner v. Astrue,* 478 F.3d 836, 842 (7th Cir. 2007). However, on the record before us, we conclude that the ALJ should have elicited additional information on the issue of mental limitations.

We first note that in the request for review of the ALJ's decision, Washington stated that "all information regarding [her] mental health was withheld for an unknown reason" and that her "request for help to get these records quickly were ignored by [her] attorney." (R. 23, 25.) Naturally, this rebuts the presumption that Washington did in fact present her best case before the ALJ.

Further, in part because Washington's initial application did not include claims of mental impairments, no agency consultant offered an opinion regarding her mental RFC. This leaves the ALJ's conclusions in both step two and the RFC assessment without support from either a consulting or treating physician. As courts have held in similar situations, remand is required. *See Richards v. Astrue,* 370 F. App'x 727, 730-31 (7th Cir. 2010); *Real v. Astrue*, No. 11 C 4205, 2012 WL 6642390, at **9-10 (N.D. Ill. Dec. 18, 2012). On remand, the ALJ should take care "to solicit additional information to flesh out an opinion" on Washington's mental limitations, if any, from treating and/or agency physicians. *Id.* (*quoting Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004)). We note that it may be necessary for the SSA to contact Washington's treating physician directly to seek additional records that were not previously submitted to the ALJ.

**E.     The ALJ Failed to Build a Logical Bridge Between the Evidence and Her Conclusion that Washington Could Perform A Reduced Range Sedentary Work.**

18

Washington takes issue with the ALJ's determination that she maintains the RFC to perform a reduced range of sedentary work. Washington argues that the ALJ failed to properly consider the impact of her migraines and disregarded favorable evidence when determining how long she can sit and use her right, dominant hand.

"The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008); 20 CFR § 416.945(a)(1); SSR 96-8p, 1996 WL 374184, at *2. The RFC is based on the medical evidence in the record and all other relevant evidence, including the claimant's testimony. *Craft*, 539 F.3d at 676; SSR 96-8p, 1996 WL 374184, at *5. "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations)." SSR, 96-8p, 1996 WL 374184, at *7.

Whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms of the underlying impairment are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on a consideration of the entire case record. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). SSR 96–7p also provides that an ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." 1996 WL 374186, at *2. With these standards in mind, we address each of Washington's arguments in turn.

### 1.    Migraines

As explained above, ALJ Goodie did not find Washington's migraines to constitute a severe impairment.  In reaching that conclusion, the ALJ pointed out that the CT scan from August 23, 2009 was unremarkable and that the most recent assessment from Washington's physician, dated February 2, 2010, indicated that the migraines were well-controlled with prescription medication.  Later in the opinion, when explaining her RFC assessment, ALJ Goodie stated that Washington "exaggerates the frequency, duration and intensity of her headaches."  (R. 38.)  Specifically, the ALJ commented that medical records do not corroborate claimant's testimony.  The ALJ again cited to the treating physician's February 2010 comments and concluded that the RFC "allows for 10% off task time in addition to normal breaks to address her complaints of headache pain."  (*Id.*)  Like Washington, we find the ALJ's analysis on this issue deficient.

Washington testified at the hearing that she suffers from migraines three times a week.  She explained that she seeks relief from those migraines by turning off all sources of noise and resting her head under a pillow.  In discrediting this testimony, the ALJ relied solely on the fact that the medical evidence did not corroborate Washington's complaints.  This alone requires remand.[9]  *See Myles v. Astrue*, 582 F.3d 672, 676-77 (7th Cir. 2009) (finding reversible error where ALJ failed to articulate his reasons for rejecting limitations, "except to say there is no objective medical evidence to support

---

[9] We note that in one paragraph, likely in an attempt to comply with SSR 96-7p, the ALJ lists Washington's daily activities.  (*See* R. 37.)  However, a list with no accompanying analysis leaves us unable to trace the ALJ's reasoning.

them.").

Furthermore, the ALJ failed to acknowledge the evidence in the record that does in fact corroborate Washington's testimony and reveals that her migraines may not be as "well-controlled" as reflected in the February 2010 treatment notes. Specifically, on October 5, 2010, Washington appears to have complained of migraines two times a week and explained, as she did at the hearing, that she seeks relief by relaxing in a dark room with no noise. Two months later, on December 2, 2010, Washington claimed only mild improvement in her migraines. The ALJ did not discuss these records, but instead, based on one treatment note, jumped to the conclusion that Washington's migraines were well-controlled and had minimal effect on her ability to work full-time. In doing so, she improperly cherry-picked evidence to support a finding of non-disability. *See Wood v. Astrue*, No. 11 C 1033, 2013 WL 1154461, at *7 (N.D. Ill. Mar. 18, 2013) ("It is well-established that an ALJ may not selectively consider medical reports or cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding") (internal quotations omitted); *see also Gholston v. Astrue*, No. 11 C 4671, 2012 WL 1463553, at *13 (N.D. Ill. Apr. 27, 2012) (noting that "improvement" in claimant's headaches did "not necessarily equate with an ability to work on a full-time basis.").

We also agree that the unremarkable CT scan does little to support the ALJ's conclusion here. As courts have recognized, diagnostic testing cannot necessarily reveal the frequency or severity of migraines. *See Strickland v. Barnhart*, 107 Fed. Appx. 685, 689 (7th Cir. 2004) ("nothing in the record suggests that [neurological] tests can confirm either the existence of migraines or their likely severity."); *Salberg v. Astrue*,

No. 11 C 175, 2012 WL 4478310, at *13 (W.D. Pa. Sept. 27, 2012) (collecting cases).

Lastly, the ALJ's finding that Washington would not be off task for more than 10% of the

work day comes without any explanation. Instead, the ALJ appears to have simply

adopted the VE's testimony regarding permissible off-task time in the work force.

For all of these reasons, we are left without a logical bridge supporting the ALJ's

conclusion that Washington's migraines would only result in 10% off-task time per day.

### 2. Ability to Sit for Six Hours

Next, Washington argues that the ALJ did not properly articulate her conclusion

that she could sit for six hours a day. According to Washington, the ALJ failed to

explain why she rejected her testimony concerning her sitting limitations, failed to

properly analyze her extreme obesity, and failed to discuss the relationship between her

knee pain and her ability to sit. We agree on all counts.

At the hearing, Washington explained she has suffered from extreme left knee

pain following a car accident in her childhood. She further testified that discomfort sets

in after thirty-five minutes of sitting. As the ALJ acknowledged, Washington's medical

records reveal extreme obesity, a "deformity of the medial cortex tibial diaphysis,"

limited left-knee flexion with pain, and a mild limp in the left knee.

In concluding that Washington could sit for six hours, the ALJ simply explained

that she afforded the agency consultant's opinion on this issue substantial weight.

Though the ALJ minimally articulated why she found Washington's alleged inability to

walk and stand to be incredible, she made no reference to Washington's testimony

regarding her inability to sit. This lack of analysis warrants reversal. *See* SSR 96-8p,

1996 WL 374184, a *7 ("The RFC assessment must include a *discussion* of why

reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.") (emphasis added).  We reject the Commissioner's citation to evidence in the record that purportedly supports the ALJ's decision on this issue, but which the ALJ did not address, such as Washington's responses in disability reports.  *See Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (noting that "the agency may not bolster the ruling with evidence the ALJ did not rely on") (*citing SEC v. Chenery Corp.*, 318 U.S. 80, 93-95, 63 S.Ct. 454, 87 L.Ed. 626 (1943)).

Further compounding the ALJ's error here is the cursory analysis regarding Washington's obesity in the face of a BMI of 51.5, well into the range of extreme obesity.  *See* SSR 02-1p, 2000 WL 628049, at *2 ("Level III [obesity], termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40.").  On remand, the ALJ should take care to address Washington's ability to sit in relation to her extreme obesity and other impairments, including her documented left knee deformity.  *See Martinez v. Astrue*, 630 F.3d 693, 698 ("It is one thing to have a bad knee; it is another thing to have a bad knee supporting a body mass index in excess of 40.").

### 3.    Use of Right Hand

Lastly, Washington argues that the ALJ ignored evidence regarding her ability to use her right, dominant hand.  Like Washington, we comment only briefly on this issue.

The ALJ determined that Washington could constantly, but not frequently, perform fine and gross manipulations with her right hand.  Though the ALJ discussed the EMG results, Dr. Deshpande's unremarkable dexterity findings, and noted the

absence of a prescription medication regime, she did not address a conflicting finding of decreased hand grip by Dr. Woods on August 24, 2009.  (R. 266.)  Nor did the ALJ address Washington's testimony regarding the difficulties she faces conducting certain daily activities, such as writing.  (R. 66-67, 81.)  Though these shortcomings may not independently warrant remand, because remand is otherwise required, the ALJ should take care to properly address this evidence.

## III.   CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment is granted in part and the Commissioner's motion is denied.  This case is remanded to the Social Security Administration for proceedings consistent with this Opinion.  It is so ordered.

**ENTERED:**

_____
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated:  May 7, 2013**

24